Filed 6/11/26  Soleimani Dental Corp. v. Baratian CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| SOLEIMANI DENTAL CORP. et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>HOUMAN BARATIAN et al.,<br><br>Defendants and Appellants. | B334175<br><br>Los Angeles County<br>Super. Ct. No. BC492238 |

APPEAL from orders of the Superior Court of Los Angeles County, Christopher K. Lui, Judge.  Reversed in part and affirmed in part.

Lewis Brisbois Bisgaard & Smith, Jeffry A. Miller, Daniel R. Velladao, Craig Holden, Ernest Slome and Robert M. Collins for Plaintiffs and Appellants.

Atabek & Co., Jon A. Atabek, Nyja A. Prior and Shirin Ehyaei; Baranov & Wittenberg and Michael M. Baranov for Defendants and Appellants.

———————————

A network of affiliated dental companies — including Soleimani Dental Corp. (SDC), S. Alexander Soleimani Dental Corp. (SASDC), and Dental Management Services, L.P. (DMS) — sued Dr. Houman Baratian, who previously worked as a dentist within the network, and Chrystal Medina, the former marketing director for the network's referral service, Smile Finders. Plaintiffs SDC and SASDC, which own dental offices, and DMS, which provides management services, assert defendants Dr. Baratian and Medina breached confidentiality agreements by leveraging the network's trade secrets to build Dr. Baratian's competing dental practice.

A jury reached a verdict for plaintiffs. It found Dr. Baratian breached his contract with DMS, to which SDC and SASDC were intended third party beneficiaries. It also found Medina breached her contract with SDC and DMS, to which SASDC was an intended third party beneficiary. On each of three custom verdict forms — those forms corresponding *not* to the three plaintiff entities but to the three alleged breaches against the named parties to the two contracts — the jury indicated SDC suffered $1,050,000, and SASDC and DMS each suffered $57,500, in lost profits damages.

Defendants moved for judgment notwithstanding the verdict (JNOV) and, in the alternative, for a new trial. The trial court denied JNOV. But it found the verdict hopelessly ambiguous as to whether the jury intended to grant each plaintiff a single damages award (which jurors simply repeated on each successive verdict form) or whether the jury intended to give three separate, identical awards to each plaintiff for each breach (such that the amounts on the three verdict forms should be summed). The trial court, therefore, ordered a new trial on

damages only. It then declined to address defendants' arguments seeking a new trial on all issues.

On appeal, defendants challenge the denial of their JNOV motion and the partial denial of their new trial motion. Plaintiffs, on cross-appeal, challenge the trial court's grant of a new trial on damages.

We reverse the order denying defendants' JNOV motion as to DMS, as there is no substantial evidence of that management company's lost profits. But we affirm the denial of JNOV with respect to SASDC and SDC, the owners of the dental offices.

We affirm the partial denial of defendants' motion for a new trial. To the extent the trial court declined to address several of defendants' arguments for a new trial on all issues, its error was not prejudicial.

We reverse the order granting a new trial as to damages. Having reviewed the verdict de novo, we conclude it is not hopelessly ambiguous. Viewed properly in context, the verdict reflects the jury intended a single award of damages for each plaintiff, rather than three separate, yet identical awards.

We, therefore, remand the matter to the trial court to enter an amended judgment on the verdict as construed in this opinion.

## BACKGROUND

Dr. Soheil Alexander Soleimani is a dentist experienced in opening and expanding dental practices. In March 2000, he and Julie Hoheb started a dental business, hoping to open 10 dental offices in about 12 to 15 years.

The business consists of a network of affiliated corporations that collectively own and operate dental offices across Southern California. SDC owns four dental offices, while SASDC owns two. DMS manages them. Smile Finders, which is not a party to

3

this appeal, is a licensed dental referral service that generates patient referrals exclusively for the DMS-managed dental offices.

Smile Finders generates patient referrals by hosting wellness events for corporations offering PPO insurance to their employees. At these events, Smile Finders's "field representatives" educate employees about preventative dentistry and invite them to its affiliated dental offices for care. Smile Finders aims to host wellness events for each of its corporate clients quarterly or semi-annually. Accordingly, field representatives not only recruit new patients, but also encounter and book appointments for existing patients. Before the events giving rise to this case, Smile Finders hosted approximately 1,000 wellness events annually.

Smile Finders's "bookers" reach out to companies to schedule wellness events. Essential to their task is Smile Finders's confidential company list. Built over time through its bookers' research efforts, the list contains detailed information for about 12,000 employers including, critically, contact information for employer representatives with whom to schedule wellness events.

Medina joined Smile Finders as a field representative in 2000. She later became a booker and eventually, as the business grew, became director of marketing. Only Medina and Smile Finders's CEO, Hoheb, had full access to the company list.

In November 2003, Medina signed a confidentiality agreement with Smile Finders, SDC, DMS, and "other Professional Corporations of Alexander Soleimani, DMD[ ] . . . ." Referring collectively to these entities as "Employer," the agreement prohibited Medina from using or disclosing without authorization "any and all information concerning any database

4

or contact names, any resources which employer uses to promote the business," and "[t]he names and addresses of Employer's contact and referral sources, and clients and prospective clients from whom Employee has solicited business while in the employ of the Employer, and all other confidential information relating to those contact and referral sources and clients . . . ."

Dr. Baratian became one of the network's contracted dentists in 2007. In April 2011, Dr. Baratian signed a contract for services with DMS containing a confidentiality clause prohibiting him from using for his own benefit DMS's "customer lists, customer information, names, addresses and information relating to leads, lists of leads, [and] names, addresses and telephone numbers of referral sources . . . ." For purposes of this clause, the contract stated "[a]ll references to DMS shall apply with equal force and effect to any and all of DMS managed and/or affiliated entities."

Subsequently, Dr. Soleimani testified, issues arose relating to Dr. Baratian's overtreatment of patients. Consequently, in March 2012, Dr. Soleimani gave Dr. Baratian a 30-day notice of his contract's termination. Before the notice period expired, employees reportedly observed Dr. Baratian photographing and taking eligibility forms from patient charts. Eligibility forms contain a patient's contact information and details of their insurance coverage. Dr. Soleimani fired Dr. Baratian soon after learning of his actions.

Meanwhile, Medina had accepted Dr. Baratian's pre-departure invitation to handle marketing for what would become Dr. Baratian's new dental practice. Medina resigned from Smile Finders, parting ways with the company at the end of April 2012. Before she left, Medina took information from Smile Finders's

5

company list, including employer names, phone numbers, and email addresses. She then used that information while working for Dr. Baratian. Medina left Dr. Baratian's employ, and stopped using the company list, in February 2013.

Shortly following the departure of Dr. Baratian and Medina, in May and June 2012, Smile Finders bookers encountered difficulty in scheduling wellness events. They informed Hoheb that employers were declining their booking requests because another dental vendor had already scheduled wellness events with them through the next year. Hoheb eventually learned Medina and Medina's staff, working for Dr. Baratian, had booked those competing events.

Around the same time, and continuing through the second and third quarters of 2012, the DMS-managed dental offices lost significant revenue. In 2012, the offices' average number of PPO patient visits fell by 44.6 percent. Dental office revenues and patient visits dropped further in 2013.

Plaintiffs, along with Smile Finders and other affiliated corporations, filed the underlying suit in September 2012. The operative second amended complaint asserted, among many others, a claim by Smile Finders against defendants for trade secret misappropriation, as well as plaintiffs' claim against defendants for breach of contract.

At trial in July 2018, the court granted nonsuit as to all pending causes of action except for Smile Finders's trade secret misappropriation claim. On that claim, the jury found for defendants, concluding their improper acquisition and use of Smile Finders's confidential company list was not a substantial factor in causing Smile Finders's damages. The trial court entered judgment for defendants in accordance with the verdict.

On appeal, our colleagues in Division Seven of this court reversed the trial court's grant of nonsuit on plaintiffs' breach of contract claim against defendants and ordered a new trial on that cause of action. (*Smile Finders v. Medina* (Oct. 19, 2021, B298590) [nonpub. opn.].) In so doing, Division Seven held plaintiffs presented prima facie evidence, sufficient to survive nonsuit, that SDC and SASDC were intended third party beneficiaries with standing to seek redress for defendants' alleged breaches of their confidentiality agreements. (*Ibid.*) In all other respects, Division Seven affirmed the judgment. (*Ibid.*)

After a second trial in May 2023, a jury reached a verdict for plaintiffs on their breach of contract claim. Per the special verdict forms jointly prepared by the parties, the jury found Dr. Baratian breached his contract with DMS, to which SDC and SASDC were third party beneficiaries, and that Medina breached her contracts with SDC and DMS, to which SASDC was a third party beneficiary. For each of these three breaches (one by Dr. Baratian and two by Medina), the jury found SDC suffered $1,035,000, and SASDC and DMS each suffered $57,500, in lost profits.

The trial court entered plaintiffs' proposed judgment, which interpreted the verdicts as awarding three identical and cumulative damages awards for each plaintiff. Thereafter, defendants moved for JNOV. In the alternative, they moved to set aside the judgment and for a new trial.

Following a hearing, the trial court denied defendants' JNOV motion and granted a new trial as to damages only. The court denied as moot defendants' motions for a new trial on all issues and to set aside the judgment.

7

Defendants appealed from the denial of their post-trial motions.  Plaintiffs cross-appealed from the order granting a new trial as to damages.

## DISCUSSION

### I.  *Judgment Notwithstanding the Verdict*

"A JNOV must be granted where, viewing the evidence in the light most favorable to the party securing the verdict, the evidence compels a verdict for the moving party as a matter of law.  [Citations.]  In general, ' "[t]he purpose of a motion for judgment notwithstanding the verdict is not to afford a review of the jury's deliberation but to prevent a miscarriage of justice in those cases where the verdict rendered is without foundation." ' " (*Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.* (2006) 144 Cal.App.4th 1175, 1194.)

The standard of review for an order denying JNOV depends on the issue presented.  "When the issue raised is whether sufficient evidence supports the jury's factual findings, appellate courts apply the substantial evidence standard." (*Cleveland v. Taft Union High School Dist.* (2022) 76 Cal.App.5th 776, 802.) Under that standard, we view the evidence in the light most favorable to the verdict, disregard conflicting evidence, and draw all legitimate inferences in the verdict's favor. (*Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 192.)  Where the motion "raises legal issues such as the application of law to undisputed facts or the interpretation of a statute or contract," our review is de novo. (*Brown v. City of Sacramento* (2019) 37 Cal.App.5th 587, 598.)

On appeal, defendants renew three of their arguments for JNOV:  (1) under *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), the trial court should have excluded evidence from an

expert critical to the jury's calculation of damages because that evidence improperly conveyed case-specific hearsay; (2) SASDC is not an intended third party beneficiary of Medina's confidentiality agreement; and (3) plaintiffs presented insufficient evidence of their lost profits.

### A. *Sanchez* Error

To prove their lost profits, plaintiffs called a financial expert, Leonard Lyons, to testify.

Lyons reviewed revenue data DMS provided for the dental offices it managed. Based on the growth he observed from 2007 to 2011, Lyons conservatively assumed that for 2012 and 2013, revenues would have increased by five percent each year. The differences in the projected and actual revenues for those years, Lyons opined, represented the revenue lost due to defendants' taking and use of Smile Finders's confidential information.

From other financial documents and discussions with DMS's Vice President of Operations, Lyons determined the dental offices spent 60.64 percent of each dollar received on variable expenses. Accordingly, Lyons multiplied each office's lost revenue for 2012 and 2013 by that percentage to ascertain the amount that would have been spent on the office's variable expenses. To calculate each office's lost profits for a given year, then, Lyons subtracted from the office's lost revenue figure the corresponding variable expense figure for that year. Ultimately, Lyons concluded the dental offices lost $4.267 million total in profits between 2012 and 2013.

Crucial to Lyons's testimony were three demonstrative exhibits containing data tables. Exhibit 124, titled Revenue Analysis, summarizes the revenue information Lyons received from DMS for 2007 through 2014. Exhibit 319 summarizes

9

Lyons's conclusions on lost profits for 2012 and 2013, as well as the offices' diminution in value as of 2013. And Exhibit 320 sets forth Lyons's computations, for 2009 through 2014, of the offices' actual and estimated revenues, revenues lost due to defendants' use of the Smile Finders's information, the portion of lost revenues that would have gone to variable expenses, and lost profits. The trial court received these exhibits into evidence.

Defendants contend the trial court should have excluded these exhibits and Lyons's related opinion testimony regarding lost profits because they conveyed inadmissible case-specific hearsay under *Sanchez*, *supra*, 63 Cal.4th 665. (See *id.* at p. 686 [experts "*cannot . . .* relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception"].) Specifically, defendants assert Lyons's exhibits and testimony related as true the offices' revenue figures drawn from the company's financial records, none of which were admitted into evidence. Without these exhibits and Lyons's testimony, defendants argue, the jury would have had no basis to calculate plaintiffs' damages. Defendants, therefore, assert JNOV should have been entered in their favor.

Plaintiffs respond that defendants forfeited their *Sanchez* argument by failing to raise it timely in the trial court. We agree and, consequently, do not consider the argument's merits.

Evidence Code section 353, subdivision (a), provides "[a] verdict shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) [t]here appears of record an objection to or a motion to exclude or to strike the evidence that was *timely made* and *so stated as to make clear the specific ground of the*

10

*objection or motion . . . .*"  (Italics added.)  "The statute does not require any particular form of objection."  (*People v. Partida* (2005) 37 Cal.4th 428, 434–435 (*Partida*).)  But the objection must "fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling."  (*Id.* at p. 435.)

Defendants, as they note, did file an unsuccessful motion in limine to exclude Lyons's testimony, but that motion did not assert *Sanchez* objections.  Instead, defendants asserted "Lyons's testimony and opinions regarding causation (and thus damages) [are] predicated on improperly speculative assumptions and improper methodologies."  Specifically, they argued, Lyons inappropriately assumed defendants' actions alone caused plaintiffs' revenue loss and failed to consider "various other factors that could have contributed to Plaintiffs' alleged damages."  They also criticized Lyons for accepting as true plaintiffs' representations concerning "the number of new, existing, and total patients, and the bottom-line number for what Plaintiffs[ ] received for each patient."  The problem, in defendants' view, was Lyons had "not performed a genuine analysis regarding causation" and had offered a conclusion on damages that "is sheer speculation, lacks foundation, and is not supported by competent expert opinion or evidence."  Nowhere in their motion did defendants assert, as they do on appeal, that Lyons, through his exhibits or testimony, would improperly convey case-specific hearsay should he testify.  Indeed, the words "hearsay" and "*Sanchez*" are nowhere to be found.  Further, the parties, in arguing the motion, and the court, in denying it,

11

focused on whether Lyons's methods were sufficiently reliable under *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 (*Sargon*).  Again, hearsay and *Sanchez* were neither raised nor discussed, and no ruling regarding these matters, or any matter other than the reliability issue, was obtained.  (See *People v. Ramos* (1997) 15 Cal.4th 1133, 1171 [failure to secure rulings results in forfeiture].)

The scope of defendants' concerns about Lyons's testimony became more concrete as trial progressed and plaintiffs actually proffered Lyons's testimony and the demonstrative exhibits.  To start, we note defendants raised no objections when Lyons sought to share, and did share, his demonstratives and calculations — Exhibits 124, 319, and 320 — with the jury during his testimony.  Only at the close of Lyons's direct examination did Medina's counsel object to admitting Exhibit 320 as lacking foundation, noting Lyons did not explain why his diminution in value calculations utilized a certain $355 figure.  In so doing, counsel briefly noted "some of the other [exhibits] . . . cite data and things like that, but it's generally sort of just, you know, hearsay."  After plaintiff's counsel argued jurors had already seen Lyons's calculations and that Lyons, when testifying, "went line by line through these exhibits, and he explained the basis for" his numbers, Medina's counsel clarified he was "not objecting as far as lost profit numbers" and solely criticized Lyons's failure to explain "how he arrived at" the $355 figure relevant to his diminution in value calculations.

Later, and again in the context of disputing Lyons's use of the $355 figure and the issue of diminution of value, Medina's counsel argued "he never actually explained how he calculated it.  And to the extent the rest of the numbers rely on it, there's no

12

foundation for it. . . . [¶] For the same reasons, his entire testimony on this issue also is" problematic under "*Sanchez*." But, again, defendants did not challenge the exhibit's inclusion of, or Lyons's references to, the numbers underlying the lost profit calculations.  The court ultimately admitted Exhibit 320, but redacted the controverted $355 figure.

Defendants identify no other objections that might have preserved a *Sanchez* argument.

In sum, defendants failed to timely object in the trial court that Exhibits 124, 319, and 320, along with Lyons's testimony regarding plaintiffs' lost profits predicated thereon, improperly conveyed case-specific hearsay by representing as true the dental offices' revenues for 2009 through 2014.  Accordingly, defendants forfeited their *Sanchez* argument and may not raise it for the first time on appeal.  (Evid. Code, § 353, subd. (a); *Partida*, *supra*, 37 Cal.4th at p. 435 [objecting parties may not argue on appeal that the trial court "should have excluded the evidence for a reason different from his trial objection"]; see also *People v. Espinoza* (2018) 23 Cal.App.5th 317, 320 [defendant forfeited *Sanchez* objection by objecting to expert testimony only as lacking in foundation].)

## B.    SASDC's Standing as a Third Party Beneficiary

Defendants assert JNOV should have been granted for Medina as to SASDC's breach of contract claim because SASDC did not exist when she signed her confidentiality agreement in 2003 and, consequently, could not have been an intended third party beneficiary to that contract.  In support, they assert "public records for SASDC show[ ] it was not incorporated until several years after the Medina Contract was entered into."

13

We reject this argument for two reasons. First, it relies on documents not properly before this court. Alongside their JNOV motion, defendants requested that the trial court judicially notice, among other things, SASDC's Articles of Incorporation filed with the California Secretary of State. The court denied the request as irrelevant, and defendants do not challenge that ruling or renew their request on appeal. Thus, although defendants cite SASDC's Articles of Incorporation in their opening brief, we do not consider it. (See *Hensel Phelps Construction Co. v. San Diego Unified Port Dist.* (2011) 197 Cal.App.4th 1020, 1028, fn. 9.) Moreover, the trial court's conclusion that the Articles of Incorporation were irrelevant was correct. A JNOV "consider[s] the trial that was actually conducted, not the one that might have been conducted," and a JNOV is not to be granted based on new evidence that could have been unearthed beforehand. (*Garretson v. Harold I. Miller* (2002) 99 Cal.App.4th 563, 575.)

Second, the two cases on which defendants rely — *Landale-Cameron Court, Inc. v. Ahonen* (2007) 155 Cal.App.4th 1401 and *Hilderman v. Enea TekSci, Inc.* (E.D. Cal. 2008) 551 F.Supp.2d 1183 — are distinguishable. Defendants correctly observe both cases involved a corporate plaintiff's unsuccessful effort to enforce, as a third party beneficiary, a contract pre-dating its formation. (*Landale*, at pp. 1403–1404, 1410; *Hilderman*, at p. 1195.) But in each case, the court found the plaintiff lacked standing to assert a breach of contract claim primarily because the contract at issue had no language evincing an intent to benefit the plaintiff. (*Landale*, at pp. 1410–1411; *Hilderman*, at p. 1195.)

14

The same is not true here. "A third party may enforce a contract made for his or her benefit or made for the benefit of a class of which he or she is a member." (*Service Employees International Union, Local 99 v. Options–A Child Care and Human Services Agency* (2011) 200 Cal.App.4th 869, 878.) "The contract need not expressly state that it is intended to benefit a third party as long as such an intent is apparent through the ordinary means of contract interpretation." (*Ibid.*)

Medina signed her confidentiality agreement with Smile Finders, DMS, SDC, and "other Professional Corporations of Alexander Soleimani, DMD[ ]. . . ." The agreement does not restrict its application to entities in existence at the time of its execution. By its plain language, then, Medina's confidentiality agreement evinces the parties' intent to benefit any and all corporations owned by Dr. Soleimani, a class of which SASDC is a member. Thus, defendants' contention fails as unsupported by the cases cited.

## C. Sufficiency of Lost Profit Evidence

Lost profits may be recoverable as damages for breach of contract "if the evidence shows, with reasonable certainty, both their occurrence and extent." (*S.C. Anderson, Inc. v. Bank of America* (1994) 24 Cal.App.4th 529, 536.) Once their existence has been established with reasonable certainty, " 'recovery will not be denied because the amount cannot be shown with mathematical precision. [Citations.] Historical data, such as past business volume, supply an acceptable basis for ascertaining lost future profits.' " (*Sargon, supra,* 55 Cal.4th at p. 774; cf. *Steelduct Co. v. Henger-Seltzer Co.* (1945) 26 Cal.2d 634, 651 [in certain situations where a plaintiff's lost-profit damages cannot be ascertained by reference to its historical financial data, "the

15

reasonable basis of estimation constituting the best and most convincing evidence of damages of which the situation admits is properly accepted as sufficient proof of damages"].)

"The Court of Appeal has defined lost profits as follows: ' "Net profits are the gains made from sales 'after deducting the value of the labor, materials, rents, and all expenses, together with the interest of the capital employed.' [Citation.]" ' [Citations.] A plaintiff must show loss of net pecuniary gain, not just loss of gross revenue." (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 884 (*Kids' Universe*).)

Defendants assert their JNOV motion should have been granted because plaintiffs failed to present "legally sufficient" evidence of their lost profits. We agree with their argument as to DMS, as plaintiffs presented no evidence showing the extent of its lost profits with reasonable certainty. As to SDC and SADC, however, substantial evidence supports the jury's finding that some, but not all, of their lost profits stemmed from defendants' use of the company list. Based thereon, the jury properly awarded less than the full amount sought in damages.

### 1.   *DMS*

As discussed above, to prove their lost profits, plaintiffs relied on Lyons's testimony and the accompanying exhibits showing the data underlying his calculations. But that evidence pertained only to the dental offices owned by SDC and SASDC. It did not address DMS's financial circumstances for the years in question.

Dr. Soleimani provided the sole evidence of DMS's finances, testifying DMS "receives a large percentage" of the offices' revenues. Plaintiffs, however, presented no evidence clarifying what that percentage is, or might be, in any given year. Nor did

16

they present any evidence of DMS's expenses, which the jury required to ascertain its lost profits. (See *Kids' Universe*, *supra*, 95 Cal.App.4th at p. 884.) Thus, plaintiffs failed to prove with reasonable certainty the occurrence and extent of DMS's "loss of net pecuniary gain" for 2012 and 2013. (*Ibid.*)

"Damages are an essential element of a breach of contract claim." (*Behnke v. State Farm General Ins. Co.* (2011) 196 Cal.App.4th 1443, 1468.) Plaintiffs sought to prove this element by establishing the dental offices lost profits and diminished in value due to defendants' use of Smile Finders's confidential information. Substantial evidence does not support the jury's finding with respect to DMS on the first damages theory. And the jury made no award on the latter theory. Nor has DMS offered any alternative theory of damages to salvage its verdict, whether to the trial court when opposing the motion for JNOV or here on appeal. "Loss of profits which exist 'only in the fond dreams of the adventurer' will not support a verdict for damages." (*Engle v. City of Oroville* (1965) 238 Cal.App.2d 266, 272.) As a matter of law, then, the evidence compels a verdict in defendants' favor on DMS's breach of contract claim. JNOV should have been granted for defendants on this claim.

### 2. *SDC and SASDC*

Defendants also contend plaintiffs offered insufficient evidence to support the jury's award of lost profits to SDC and SASDC. Lyons, they assert, did not account for other potential causes of those entities' lost revenues and did not provide the jury a means of awarding, as they did here, damages less than the amount sought. According to defendants, plaintiffs could have, and should have, proven their lost profits by showing how many wellness events they were prevented from booking, the number of

17

new patients they lost as a result, and the revenue each patient would have brought in.

Defendants' attack on the weight of Lyons's testimony misunderstands the applicable substantial evidence standard of review. Per this standard, we do not reweigh the evidence or evaluate witness credibility. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581–583.) Instead, in reviewing whether substantial evidence supports a finding, we accept all evidence supporting the finding, disregard contrary evidence, and draw all reasonable inferences in support of it. (*Id.* at p. 581.)

Applying this test, the jury's lost profits findings as to SDC and SASDC are supported. The evidence shows the dental offices owned by SDC and SASDC experienced a significant drop in PPO patients and, correspondingly, revenue in 2012 and 2013, following Medina's use of Smile Finders's company list, which enabled Dr. Baratian's new dental practice to take patients and box plaintiffs out of wellness events that had been crucial to their success. Using historical revenue figures from DMS, Lyons conservatively projected dental office revenues would have grown by five percent each year and concluded the difference between the offices' projected and actual revenues constituted the revenues lost due to defendants' malfeasance. Lyons then deducted from the lost revenues the dollar amount that would have gone to variable expenses to discern each office's lost profits. For 2012 and 2013, he concluded, SDC and SASDC lost $4,267,791.95 in profits.

According to Lyons, defendants' use of Smile Finders's list was the sole, material cause of SDC's and SASDC's revenue loss. Medina, however, testified to other factors that may have contributed to plaintiffs' revenue loss, including operational

18

changes implemented in 2010 and 2011, which resulted in patient dissatisfaction.

As the trier of fact, the jury "has wide latitude to believe or disbelieve witnesses, or even specific portions of their testimony, as it sees fit." (*In re Lopez* (2023) 14 Cal.5th 562, 591.) In so doing, the jury " ' "may reject part of the testimony of a witness . . . and combine the accepted portions with bits of testimony or inferences from the testimony of other witnesses thus weaving a cloth of truth out of selected available material." ' " (*Ibid.*)

The jury, therefore, could have properly accepted that SDC and SASDC suffered lost profits in a manner consistent with Lyons's calculations, while rejecting his view that defendants' actions were the sole cause thereof and crediting Medina's testimony that other factors were at play. Using these findings in its " 'inherently subjective task of calculating damages[,]' " the jury could have appropriately awarded lost profits to SDC and SASDC in amounts less than those opined by Lyons. (*Orozco v. WPV San Jose, LLC* (2019) 36 Cal.App.5th 375, 401 ["It is of no moment that the jury's lost profits calculation ultimately did not precisely match any of the figures testified to by the parties' experts. As one court has noted about a jury's determination of economic damages based on expert testimony, 'between black and white are various shades of gray, and all of the colors of the rainbow as well' "]; cf. *Abbott v. Taz Exp.* (1998) 67 Cal.App.4th 853, 857 ["Even where there is undisputed evidence regarding a specific component of damages, a lesser award is not necessarily inadequate as a matter of law where it may be justified on an alternative basis"].)

**D. Conclusion**

In sum, JNOV should have been granted for defendants on DMS's breach of contract claim. JNOV was properly denied with respect to the claims asserted by SDC and SASDC.

**II.** *Denial of Motion for a New Trial as to All Issues*[1]

The trial court may grant a new trial when it finds the moving party's substantial rights were materially affected by, among other things, an irregularity in the proceedings of the court, jury, or adverse party, or any court orders preventing a fair trial; juror misconduct; or insufficiency of the evidence to justify the verdict. (Code Civ. Proc., § 657, subds. (1), (2), & (6).)

"As a general matter, the denial of a motion for new trial is reviewed for abuse of discretion, with the appellate court making an independent determination as to whether any error was prejudicial. [Citations.] However, 'any determination underlying [the new trial] order is scrutinized under the test appropriate to such determination.' " (*Argueta v. Worldwide Flight Services, Inc.* (2023) 97 Cal.App.5th 822, 832–833.)

Defendants sought a new trial as to all issues on several grounds, including juror misconduct, instructional error, the time constraints imposed by the trial court's scheduling order, and insufficiency of the evidence to support the verdict. Alternatively, they sought a new trial on damages only. On the latter request, they incorporated by reference their argument,

---

[1] We reject plaintiffs' contention that we lack jurisdiction to entertain defendants' challenges to the partial denial of their motion for a new trial. "[I]t is well established that a party seeking a new trial on all issues is an 'aggrieved party' when only a partial new trial is granted, and may appeal therefrom." (*Liodas v. Sahadi* (1977) 19 Cal.3d 278, 285.)

20

detailed in a separate motion, that the judgment must be vacated because, contrary to the jury's clear intent to "award one instance of damages, jointly and severally, to be apportioned by the [c]ourt," the judgment tripled the jury's verdict. Nonetheless, defendants recognized the court could instead find the verdict hopelessly ambiguous and, consequently, order retrial on damages only.

The trial court accepted defendants' contention that the verdict was hopelessly ambiguous and granted a new trial limited to damages. The court then determined this ruling rendered defendants' other arguments moot and declined to address them.

Defendants assert the trial court erred by ruling only on their alternative request for relief and rejecting as moot their arguments seeking a new trial on all issues. Therefore, defendants argue, the matter should be remanded to the trial court to consider those arguments on the merits. Alternatively, they contend the court's error was prejudicial, and the denial must be reversed, because, had the court considered all of their arguments, the court would have granted the broader relief sought and ordered a full retrial.

We agree that the trial court's grant of a new trial on damages did not render irrelevant, unnecessary, or impossible a ruling on defendants' arguments seeking retrial of all issues. Thus, the court erred in treating those arguments as moot. (Cf. *Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1190, fn. 7 [a matter is not moot so long as the court can grant the relief sought].) Its "failure to exercise its discretion" to ascertain defendants' entitlement to the broader relief sought "was itself an abuse of discretion." (*Richards, Watson & Gershon v. King* (1995) 39 Cal.App.4th 1176, 1180.)

21

Rather than remanding the matter to the trial court, however, we will independently evaluate whether the court's error was prejudicial.  (See *City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 872 [in reviewing an order denying a motion for a new trial, appellate courts must "make an independent determination as to whether the error was prejudicial"]; see also *TRC Operating Co., Inc. v. Chevron USA, Inc.* (2024) 102 Cal.App.5th 1040, 1083 [same]; but see *Barrese v. Murray* (2011) 198 Cal.App.4th 494, 505, 508 [reversing denial of new trial motion and remanding the case with instructions to evaluate the motion].)  As discussed below, defendants are not entitled to a new trial per the grounds asserted on appeal and, thus, suffered no prejudice from the trial court's refusal to address their arguments.

## A.    Instructional Error

"Upon request, a party in a civil case is entitled to correct, nonargumentative jury instructions on every theory of the case that is supported by substantial evidence.  [Citations.]  The trial court has no duty to instruct on its own motion, nor is it obligated to modify proposed instructions to make them complete or correct."  (*Maureen K. v. Tuschka* (2013) 215 Cal.App.4th 519, 526.)  "When the trial court chooses to give an instruction, however, it must be a correct statement of the law."  (*Ibid.*)  Where instructional "error exists, 'we must determine whether it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of error.' "  (*Garrabrants v. Erhart* (2023) 98 Cal.App.5th 486, 496)

The trial court instructed jurors on the prior trial's preclusive effect as follows:  "You have heard that there was a previous trial involving some of these parties.  In that case, the

22

following findings of fact were made: [¶] 1. Smile Finders owned a Company List relating to local or regional companies; [¶] 2. That the Company List was misappropriated by the Defendants Houman Baratian D.D.M. and Chrystal Medina; [¶] 3. That the Company List was a secret at the time it was misappropriated; [¶] 4. That the Company List had actual or potential independent economic value because it was secret; [¶] 5. That Smile Finders undertook reasonable efforts under the circumstances to keep the Company List secret and [¶] 6. That the Defendants Houman Baratian D.D.M. and Chrystal Medina acquired or used the Company List. [¶] No further evidence is necessary on these issues and you must accept these facts as true."

Defendants challenge this instruction as incomplete and, therefore, misleading because it "omitt[ed] the fact that Smile Finders failed to prove its damages." They contend: "By electing to give only a partial picture, the trial court left the jury with the notion that [plaintiffs] had won the prior trial, and that all that remained was to award damages."

This argument does not persuade. Before giving the instruction in question, the trial court gave CACI No. 303, thereby instructing the jury that to recover damages, plaintiffs had to "prove all of the following" as to each defendant: (1) the plaintiff entered into a contract with the defendant; (2) plaintiffs fulfilled their contractual obligations; (3) the conditions required for the defendant's performance had been satisfied; (4) the defendant failed to do something required by the contract; (5) plaintiffs were harmed by the defendant's failure; and (6) the defendant's breach was a substantial factor in causing plaintiffs' harm. Accordingly, viewed alongside CACI No. 303, the

23

challenged instruction simply required the jury to accept as true certain facts relating to defendants' use of Smile Finders's company list in discerning whether plaintiffs carried their burden of proof. It did not, as defendants argue, imply that the jury need only evaluate the extent of plaintiffs' damages.

In addition, defendants failed to show prejudice arising from the asserted error. (*Garrabrants v. Erhart*, *supra*, 98 Cal.App.5th at p. 496.) In assessing prejudice from instructional error in civil cases, courts examine several factors, including "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580–581, fn. omitted.)

Defendants address only one of the *Soule* factors, contending plaintiffs' counsel "seized on" the instruction's misleading nature in closing argument by averring "the prior jury's findings precluded [defendants'] arguments on damages and causation . . . ." But the record demonstrates counsel did nothing of the sort. Instead, plaintiffs' counsel asserted that, due to the prior jury's findings on defendants' use of the company list, the key factual issues for the present jury's consideration were whether and to what extent plaintiffs were harmed by defendants' actions. On those issues, counsel asked the jury to reject as implausible defendants' theory that their actions were not a substantial factor in causing plaintiffs' economic losses in 2012 and 2013.

Moreover, the trial court did not, as defendants contend, "recognize[ ] the potential for prejudice arising from the prior jury's verdict." Per the portion of the reporter's transcript cited in the opening brief on this point, the court rejected

24

plaintiffs' request to admit into evidence a redacted version of the prior jury verdict, finding it "redundant to [its] instruction."

In sum, defendants are not entitled to a new trial based on the claimed instructional error.

## B.    Scheduling Order

Among numerous other responsibilities, judges who preside over trials must ensure "juries are properly cared for and that all court cases assigned to them are fairly and efficiently heard and decided." (*California Crane School, Inc. v. National Com. for Certification of Crane Operators* (2014) 226 Cal.App.4th 12, 19 (*CA Crane School*).)  In service of those responsibilities, the trial judge may set time limits for trial. (*Ibid.*)  If the trial judge determines such limits should be set, "the court should first elicit estimates from the parties and invite each side to comment on the other's estimate.  Once the parties have presented their views, the court should independently evaluate the estimates based on the arguments of the parties, the state of the pleadings, the legal and factual issues presented, the number of witnesses likely to testify, the court's trial schedule and hours, and the court's experience in trying similar cases." (*Id.* at p. 20.)

"Regardless of whether court-imposed time limits are expressed in [court] days or hours, any time limit order should be reasonable, mindful that each party is entitled to a full and fair opportunity to present its case." (*CA Crane School*, *supra*, 226 Cal.App.4th at p. 21.)  "Any limits imposed should be subject to revision (upward or downward) for good cause shown either on a party's or the court's own motion." (*Ibid.*)

Although not entirely clear, defendants appear to argue that the trial court abused its discretion by issuing a scheduling order limiting trial to eight court hours per side.  They contend

25

the order unfairly penalized them for plaintiffs' failure to timely prepare for trial and prevented them from fully presenting their case.

Defendants' argument fails.  The trial court issued the scheduling order based on *both parties*' — not just plaintiffs' — non-compliance with its final status conference order.  Specifically, the court found the parties failed to meet and confer sufficiently in advance to prepare and file a joint statement to be read to the jury, a joint witness list with time estimates for direct, cross, and redirect examination for each witness, or a joint exhibit list with potential evidentiary objections.  Instead, the court noted, the parties each filed their own, non-compliant versions of these documents.  Further, defendants failed to file a trial brief.

The trial court determined the deficiencies in the parties' trial readiness documents reflected a "lack of diligent and cooperative trial preparation," and caused the court "concern that the trial will not be conducted in an efficient manner, wasting jurors' time and injecting additional uncertainty into the scheduling of future trials."  Based on these findings, and its review of numerous factors, including the pleadings, the verdict in the prior trial, and the prior appellate opinion, the court found an eight-hour time allotment for each side to be the "reasonable and appropriate amount of time for the parties to complete this trial."

Despite the detailed findings underlying the scheduling order, defendants argue, without pertinent record citations, that plaintiffs alone were to blame.  Their unsupported contentions fail to establish an abuse of discretion.

We are also unpersuaded that the scheduling order deprived defendants of their ability to fully present their case.  In limiting the time for trial, the court explained it would "consider reasonable requests for upward or downward revision of the time limits, so long as the requestor can show good cause." Throughout trial, the court frequently apprised the parties of their remaining time.  Although informed they had limited time to present their case following plaintiffs' case-in-chief, defendants did not request an upward revision of time to present the additional evidence identified in their opening brief.

Finally, defendants have not shown prejudice.  (See *Dunford v. General Water Heater Corp.* (1957) 150 Cal.App.2d 260, 266 ["[P]rejudice must be affirmatively shown by the party seeking a new trial"].)  Had they been given more time, defendants argue, they would have elicited from Alexis Bonilla, a "[c]ritical impeachment witness[ ]," additional testimony on several "critical topics."  They also would have called another witness, Sayda Lopez, to testify.  Defendants, however, cite nothing in the record supporting their offer of proof.  Nor do they explain how the evidence would have turned the tide in their favor at trial.

Accordingly, defendants are not entitled to a new trial based on the trial court's scheduling order.

### C.    Juror Misconduct

In ruling on a new trial motion based on juror misconduct, courts determine whether admissible evidence filed in support thereof establishes prejudicial misconduct.  (*Whitlock v. Foster Wheeler, LLC* (2008) 160 Cal.App.4th 149, 160 (*Whitlock*).)

Defendants rely on a juror's declaration to assert prejudicial misconduct by Juror No. 9 in deliberations.  The

27

declaration stated that, upon learning the other jurors felt plaintiffs had not proven $4 million in lost profits, "Juror No. 9 became animated, . . . began to vociferously advocate on behalf of Plaintiffs[,]" and stated that "based on her personal experience" working in the dental industry, "the dollar amounts were not only realistic, but very real." Such behavior, defendants argue, is "clearly misconduct" because Juror No. 9 injected her "industry specific experience" into deliberations. (Italics omitted.)

Conceding the juror's declaration is admissible, plaintiffs assert it fails to establish prejudicial misconduct. In their view, Juror No. 9 reasonably and properly referenced her personal experience to evaluate plaintiffs' evidence of damages.

We agree with plaintiffs. "[I]f we allow jurors with specialized knowledge to sit on a jury, and we do, we must allow those jurors to use their experience in evaluating and interpreting that evidence. Moreover, during the give and take of deliberations, it is virtually impossible to divorce completely one's background from one's analysis of the evidence. We cannot demand that jurors, especially lay jurors not versed in the subtle distinctions that attorneys draw, never refer to their background during deliberations." *(People v. Steele* (2002) 27 Cal.4th 1230, 1266.) Though "[a] fine line exists between using one's background in analyzing the evidence, which is appropriate, even inevitable, and injecting 'an opinion explicitly based on specialized information obtained from outside sources,' which [our Supreme Court] ha[s] described as misconduct" (*ibid*), Juror No. 9 did not cross that line when expressing she believed plaintiffs' damages figures. Rather than "interject[ ]" matters from outside the trial the lawyers could not have anticipated (see *Whitlock, supra,* 160 Cal.App.4th at p. 161), Juror No. 9

28

generally, and appropriately, "describe[d] a personal experience in the course of deliberations" that demonstrated why she believed certain evidence. (*Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 819; cf. *Smoketree-Lake Murray, Ltd. v. Mills Concrete Construction Co. Inc.* (1991) 234 Cal.App.3d 1724, 1745–1746, 1749 [juror engaged in misconduct in deliberations by using cat litter and crayons to demonstrate how concrete was poured, and by representing she had special knowledge about concrete practices from family members].) Also, we see no prejudice given the jury roundly rejected, as discussed below in part III, a damages award consistent with Juror No. 9's maximalist position. In fact, when jurors were polled about the damages awards, Juror No. 9 indicated that none of the awards represented her assessment.

### D. Sufficiency of Evidence as to Lost Profits

Lastly, defendants contend the matter must be retried because, based on plaintiffs' deficient evidence as to damages, the jury "clearly should have reached a different verdict or decision." (Code Civ. Proc., § 657.) In so doing, they reiterate the contentions raised in support of their JNOV motion, arguing plaintiffs presented inadequate evidence: (1) enabling the jury to calculate DMS's lost profits; (2) demonstrating SASDC is an intended third party beneficiary of Medina's confidentiality agreement; and (3) permitting the jury to award damages in amounts less than those opined by Lyons.

Per our analysis in Discussion part I, *ante*, we reject defendants' arguments. With respect to DMS, defendants' contention is moot, as JNOV should have been granted in their favor on DMS's contract claims. (Discussion, part I.C.1, *ante*.) Regarding defendants' remaining arguments, the record contains

29

sufficient evidence demonstrating SASDC is an intended third party beneficiary of Medina's confidentiality agreement, and from which the jury could appropriately find SDC and SASDC suffered lost profits per Lyons's calculations, for which defendants were only partly responsible and, thus, award less than the amount plaintiffs had sought. (See Discussion, parts I.B & I.C.2, *ante*.)

### E.    Conclusion

The trial court should have addressed defendants' arguments seeking retrial on all issues. Its failure to do so, however, resulted in no prejudice to defendants because they failed to demonstrate entitlement to the broader relief sought.

## III.    *Partial Grant of Motion for a New Trial*

The parties prepared three special verdict forms for the jury. The forms corresponded with, and asked the jury to make similar findings about, the three alleged breaches of contract: first, Dr. Baratian's breach of his confidentiality agreement with DMS; second, Medina's breach of her confidentiality agreement with SDC; and third, Medina's breach of her confidentiality agreement with DMS. To the extent applicable for each breach, the forms asked the jury whether SASDC, SDC, or DMS, when not a party to the specific contract at issue, were nonetheless intended third party beneficiaries. For each breach causing plaintiffs harm, the forms asked: "What are the damages of Plaintiffs [SDC, SASDC, and DMS] caused by" the defendant at issue? On all three forms, the jury answered that question by stating SDC suffered $1,035,000, SASDC suffered $57,500, and DMS suffered $57,500 in lost profits.

In challenging the trial court's grant of a new trial as to damages, plaintiffs assert defendants forfeited their objection to the verdict as hopelessly ambiguous by failing to seek

30

clarification prior to the jury's discharge. If not forfeited, they contend, the court should have rejected defendants' argument because the verdict is not hopelessly ambiguous, and instead reflects a clear intent to award each plaintiff a separate damages award for each of the three breaches found.

Defendants respond that a forfeiture finding is not mandatory and agree that the trial court erred by finding the verdict hopelessly ambiguous. But according to defendants, the verdict evinces the jury's intent to award each plaintiff a single award of damages, for which defendants are jointly and severally liable.[2]

Although plaintiffs correctly observe defendants did not object to the verdict forms or ask the jury to clarify its verdict, we decline to treat the issues relating to its ambiguity as forfeited. "Frequently, failure to object to the form of a verdict before the jury is discharged has been held to be a [forfeiture] of any defect."

---

[2] By finding the verdict hopelessly ambiguous, the trial court implicitly rejected defendants' contention, raised in their motion to set aside the judgment and incorporated by reference into their motion for a new trial, that the verdict reflects the jury's intent to grant each plaintiff a single damages award. Defendants, however, did not challenge this ruling in their opening brief on appeal. Ordinarily, "[a]n appellant . . . forfeits an issue by failing to raise it in his or her opening brief." (*Doe v. California Dept. of Justice* (2009) 173 Cal.App.4th 1095, 1115.) Here, however, defendants' argument is inextricably interwoven with the central issue in plaintiffs' cross-appeal, namely, the proper interpretation of the jury's verdict. And plaintiffs address it fully in their cross-reply brief. We, therefore, will consider defendants' contention. (Cf. *City of Santa Maria v. Cohen* (2017) 11 Cal.App.5th 96, 106–108 [reversing based on a respondent's argument despite its failure to cross-appeal].)

(*Woodcock v. Fontana Scaffolding & Equipment Co.* (1968) 69 Cal.2d 452, 456, fn. 2 (*Woodcock*).) But we need not find forfeiture where, as here, the record does not demonstrate the failure to object stemmed from "a desire to reap a 'technical advantage' or engage in a 'litigious strategy.' " (*Ibid*; see also *Mixon v. Riverview Hospital* (1967) 254 Cal.App.2d 364, 377 (*Mixon*) ["[I]t is not universally true that clarification of a verdict must be made before the jury has been discharged"].) We will review the merits of the trial court's ruling.

The trial court interprets a potentially ambiguous verdict " ' "from its language considered in connection with the pleadings, evidence and instructions," ' and counsel's argument to the jury." (*Fuller v. Department of Transportation* (2019) 38 Cal.App.5th 1034, 1038.) "Where the trial court has refused to interpret the verdict or has interpreted it erroneously, the appellate court will interpret the verdict if it is possible to give a correct interpretation." (*Mixon*, *supra*, 254 Cal.App.2d at p. 375.) "If the verdict is hopelessly ambiguous, a reversal is required, although retrial may be limited to the issue of damages." (*Woodcock*, *supra*, 69 Cal.2d at p. 457.) "On appeal, we review the special verdict de novo." (*Fuller*, at p. 1038.)

Applying these principles, we conclude the verdict is merely, not hopelessly, ambiguous, and can be given a correct interpretation. Viewed in context, the verdict evinces the jury's intent to grant each plaintiff a single award of damages for which defendants are collectively responsible, rather than three separate and identical awards.

The operative complaint's breach of contract claim rests on a single theory of collective malfeasance, rather than separate acts by each defendant giving rise to distinct damages.

Specifically, it alleges defendants breached their respective confidentiality agreements by mutually agreeing to "reproduce, copy, convert, and/or otherwise misappropriate" plaintiffs' trade secrets to engage in competing commercial enterprise.

Consistent with the theory of liability alleged, plaintiffs sought to prove the damages they suffered from defendants' joint use of Smile Finders's company list to open and operate Dr. Baratian's new dental practice. At trial, their witnesses testified defendants' scheme caused them economic harm by preventing Smile Finders bookers from scheduling wellness events with its corporate clients, resulting in fewer PPO patient visits and revenue losses in 2012 and 2013. Lyons testified to the specifics of their harm, computing the extent to which, in his view, each dental office suffered lost profits in 2012 and 2013. Plaintiffs presented no evidence elucidating the extent to which each defendant, or breach, individually contributed to their losses.

Nor did counsels' closing arguments suggest liability could or should be apportioned between defendants or the specific breaches alleged. Plaintiffs' counsel averred that plaintiffs carried their burden of proving causation and damages, the key factual issues at trial, and asserted the jury should reject defendants' position that their misconduct was not a substantial factor in causing the harms alleged. Defense counsel responded largely by attributing plaintiffs' injuries to other causes. In reply, plaintiffs' counsel referred again to a single award of damages for lost profits, telling the jury "the lost profit number that [plaintiffs are] asking for" is "$4.2 million."

While deliberating, the jury asked the following question relating to damages and the three special verdict forms: "With respect to the aggregate amount of damages, does the jury need

33

to allocate this total amount attributable to each defendant?  Or is a total amount for all defendants as a group be [*sic*] sufficient (which could be shown on each special verdict)?  For example, if the total damages are $10 on each special verdict, does this need to be divided among each defendant?  Or is joint and several liability sufficient?"  The trial court answered:  "Do not attempt to divide the damages between the defendants.  The allocation of responsibility for payment of damages among multiple defendants is to be done by the court after you reach your verdict."  Through this response, the court instructed the jury to fill in on each form the aggregate damages for each plaintiff, and not to ascertain or award damages based on the harms "attributable to each defendant."  It also implicitly adopted the question's alternative proposal — to select one "*total amount for all defendants as a group*" which jurors would then "*show*[ ] *on each special verdict*."  (Italics added.)

    The record also does not demonstrate the jury intended to award separate and identical sums against Medina for two breaches.  As noted above, plaintiffs sought to recoup the lost profits stemming from *one* course of conduct on Medina's part, which breached a *single* contract, to which SDC and DMS were parties, and of which SASDC was a third party beneficiary.  True, the verdict forms required the jury to evaluate Medina's liability separately with respect to the two plaintiffs who were parties to her contract.  But the jury was presented with no evidence or argument enabling it to conclude — as plaintiffs contend — that SDC, DMS, and SASDC each suffered distinct harms arising from Medina's two breaches, let alone harms coincidentally equal in value.  Put another way, it is inconceivable the jury meant to award twice the damages against

Medina solely because the contract she breached had two named parties and one third party beneficiary whereas the contract Baratian breached had one named party and two third-party beneficiaries.

In sum, the verdict reflects the jury intended for each plaintiff a single, aggregate award of damages from the defendants "as a group," finding that due to the three breaches found — one by Dr. Baratian and two by Medina — SDC suffered $1,035,000, and SASDC and DMS each suffered $57,500, in total lost profits. Put differently, the jury intended to award in favor of each plaintiff one award of damages, for which defendants, "as a group," bore liability. It could not, and did not, evaluate the harms stemming from each breach to award damages in the manner plaintiffs contend.

Accordingly, the trial court erred in finding the verdict hopelessly ambiguous and granting a new trial as to damages.

Although jurors were told not to concern themselves with allocating defendants' responsibility to pay the total award, defendants, on appeal, have argued for and requested joint and several liability. We see no reason, as we bring closure to this long-running dispute, to not order what defendants seek.

## DISPOSITION

We reverse the order denying defendants' motion for JNOV as to DMS.  In all other respects, the order is affirmed.

We affirm the order denying in part defendants' motion for a new trial.  We reverse the grant of a new trial as to damages.

On remand, we direct the trial court to enter an amended judgment on the verdict awarding SDC $1,035,000 and SASDC $57,500 in damages, for which Dr. Baratian and Medina are jointly and severally liable.

In the interests of justice, the parties shall bear their own costs on appeal.

SCHERB, J.

We concur:

STRATTON, P. J.

VIRAMONTES, J.